UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 18 CR 743 |
| v. ) | |
| ) | Hon. John Z. Lee |
| BRANDON PITTS ) | |

**GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., the United States Attorney for the Northern District of Illinois, hereby submits this Supplemental Sentencing Memorandum, pursuant to the Court's March 2, 2021 Minute Order (Dkt. # 316), to address several issues raised during the sentencing hearing held on March 2, 2021, including (1) whether Guideline § 2X1.1 should be applied to defendant's Guidelines offense level calculation; (2) the evidence, including text messages, that defendant participated in the scheme prior to the expiration of his probation on January 31, 2014; and (3) evidence of defendant's knowledge of the maximum possible amount of a claim and that non-exhausted fraudulent claims were stopped by some intervening event, including law enforcement or a victim's actions.

**I. GUIDELINE § 2X1.1**

Defendant asserts that he should be entitled to a three-level reduction in offense level under Guideline § 2X1.1(b)(2). That Guideline section provides for a three-level reduction for conspiracy offenses "unless the defendant or a co-conspirator completed all of the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the

1

conspirators were about to complete all such acts but for the apprehension or interruption by some similar event beyond their control." That provision does not apply in this case, where defendant and his co-schemers took all of the steps necessary to complete the offense of wire fraud, even though defendant may not have exhausted every fraudulent IDES claim he made.

This precise issue was addressed by the Seventh Circuit in *United States v. Calvin*, 191 F. App'x 453 (7th Cir. 2006), where the defendant was charged with fraudulently offering to sell on the internet items she did not possess. The Court held that even though Calvin did not succeed in receiving all of the amounts she attempted to get from her victims, she had completed each of the elements of wire fraud: "By the very nature of these offenses, the mere existence of a scheme plus the use of the mail or an interstate wire to further the fraudulent enterprise *completes the offense*." *Id.* at 456 (emphasis added). Specifically, the Seventh Circuit held that "Calvin devised a scheme to swindle unwitting victims out of their money and used the mail, internet, telephones, and e-mail to further her scheme. Moreover, Calvin pleaded guilty to one count each of mail fraud and wire fraud, and a 'defendant's plea of guilty to the substantive, completed offense of fraud is powerful evidence that [she] merited no reduction for the allegedly uncompleted nature of [her] scheme.' *Id.* at 456–57 (7th Cir. 2006) (quoting *United States v. Strozier,* 981 F.2d 281, 285 (7th Cir. 1992) and citing *United States v. Torres,* 209 F.3d 308, 312 (3d Cir. 2000)).

The same is true here. Pitts completed – and has pleaded guilty to – every act necessary to commit the substantive offenses of mail fraud and wire fraud. "The fact

2

that [defendant] did not succeed in achieving the full amount of loss [defendant] intended does not transform [the] scheme into a 'partially completed' offense for purposes of § 2X1.1." *Calvin*, 191 F. App'x at 457 (quoting *Strozier,* 981 F.2d at 285; and citing *United States v. Lorefice,* 192 F.3d 647, 655-56 (7th Cir.1999); *United States v. Coffman,* 94 F.3d 330, 337 (7th Cir.1996); *United States v. DeSantis,* 237 F.3d 607, 612-13 (6th Cir. 2001); *United States v. Blitz,* 151 F.3d 1002, 1011 (9th Cir. 1998)).

The cases defendant cites do not alter this fundamental holding. In *United States v. Maggi*, 44 F.3d 478 (7th Cir. 1995), the Seventh Circuit held that the district court had not made a factual finding that defendant, who was convicted of conspiracy to commit money laundering and obstruction of justice, had completed her part of the money laundering conspiracy before deciding that the § 2X1.1(b)(2) did not apply. In a money laundering conspiracy, a defendant can *agree* to participate, without actually performing the acts to complete the offense of money laundering, and thus a finding by the Court was necessary before failing to make the offense level reduction. Here, defendant's guilty plea to wire fraud – not a conspiracy to commit wire fraud – and the Court's acceptance of that guilty plea, is sufficient to find that defendant completed all of the necessary steps to complete the charged offense.

Similarly, in *United States v. John*, 597 F.3d 263 (5th Cir. 2010), defendant was charged and convicted of conspiracy to commit access device fraud, in violation of 18 U.S.C. § 371, various counts of access device fraud, in violation of 18 U.S.C. § 1029(a)(5) and exceeding authorized access to a protected computer, in violation of

18 U.S.C. § 1030, in connection with her provision of Citibank account information to her half-brother. The defendant argued that she should receive the three-point reduction because only eight of the 76 accounts she had provided were ever actually accessed by her or her confederates. *John*, 597 F.3d at 281-82. The Fifth Circuit held that "in order to complete the scheme with regard to the accounts … someone would have had to have requested a change of address, Citigroup would have had to have complied, and a confederate would have to have been added as an authorized user by Citigroup before the account could have been accessed. With regard to the accounts for which [a confederate] had only copies of checks, it is unclear whether Citigroup customer accounts could have been accessed with just this information, and if so how." *Id*. at 284. Here, by contrast, the only losses for which defendant is liable are losses where a claim was made to IDES, and all of the steps had been taken to secure the funds with the exception of using the IDES debit card that Chase had issued; in other words, no further steps were necessary for defendant to complete the offense of wire fraud, and for a substantial number of claims the only reason the full amount of any claim was not made was because of some outside event (as discussed further below).

Accordingly, because defendant's scheme to defraud IDES was completed when defendant and his co-defendants fraudulently made their IDES claims, Guideline § 2X1.1(b)(2) does not apply.

4

## II. EVIDENCE OF DEFENDANT'S PARTICIPATION IN THE SCHEME PRIOR TO JANUARY 31, 2014

The PSR adds two points to defendant's criminal history score, pursuant to Guideline § 4A1.1(d), because defendant "committed the instant offense while under a criminal justice sentence for resisting law enforcement (Docket No. 49F24-1306-FD-042479)." PSR ¶ 76. Defendant objects to the application of this provision because, he contends, "the government has offered no proof that this defendant actually joined the conspiracy before February 1, 2014." To the contrary, the government produced in discovery significant evidence that defendant was involved in the scheme prior to February 1, 2014. Some of that evidence includes the following:[1]

- **Victim M.H.:** On December 3, 2013, an individual named "Kevo" sent defendant a text messages containing an address on Allemong Dr. in Matteson, Illinois; defendant responded "For dat shit can just cash you out." *See* Exhibit A at 1210.[2] On December 5, 2013, defendant sent "Kevo" a text message that read "Should be there Saturday if not Monday" followed by the name of Victim M.H. *See* Exhibit A at 1209. On

---

[1] The government is filing the exhibits referenced in this section under seal in order to preserve the confidentiality of the personal information of the victims identified in the documents. All of the text messages provided in the exhibits were found on the mobile telephone seized from defendant on May 20, 2014, during a search and arrest in California.

[2] In the United States' Objections to Presentence Investigation Report and Position Paper as to Sentencing Factors, Dkt. #312 ("Government's Sentencing Memorandum"), the government mistakenly referred to these text messages as between defendant and Kewan Watts. In fact, they are text messages between defendant and "Kevo," who has not been charged.

December 9, 2013, IDES mailed a claim notification to Victim M.H. at the same Allemong Drive address provided to defendant by "Kevo." *See* Exhibit B. According to Chase records, on December 4, 2013, an IDES debit card was activated using the identification of Victim M.H.; the address listed was on Indian Hill Drive in Country Club Hills, Illinois. *See* Exhibit C. According to Chase records, the card associated with Victim M.H. was used to make withdrawals on December 23, 2013 and January 2, 2014. *See* Exhibit D. Defendant gave the Indian Hill Drive address in a February 14, 2014 text message to "Porscha," and defendant is associated with that address in numerous records. *See* Exhibit E.

- **Victim S.C.:** According to Chase records, on October 31, 2013, an IDES debit card was issued to Victim S.C. at the same Indian Hill Drive address. *See* Exhibit F. According to Chase records, the card issued to Victim S.C. was used to make withdrawals on November 15, 2013, and November 29, 2013. *See* Exhibit G. That evidence further shows that defendant was involved in a fraudulent claim made in the name of Victim S.C. long before the expiration of his sentence on January 31, 2014.

- **Victim T.G.:** According to Chase records, on November 6, 2013, an IDES debit card was issued to Victim T.G. at the same Indian Hill Drive

6

address. *See* Exhibit H. According to Chase records, the card issued to Victim T.G. was used to make withdrawals on January 3, 2014, and January 27, 2014. *See* Exhibit I. An image taken by a Chase security camera at the time of the January 3, 2014 withdrawal shows an individual resembling defendant. *See* Exhibit J.

- **Victim T.A. and Victim A.H.:** According to Chase records, on November 6, 2013, an IDES debit card was issued to Victim T.A. at an address on Blackhawk Drive in University Park, Illinois, houses away from defendant's current address. *See* Exhibit K; *see also* PSR at 3. That card was used to make withdrawals on November 21, 2013, and December 5, 2013. *See* Exhibit L. Similarly, according to Chase records, on November 5, 2013, an IDES debit card was issued to Victim A.H. at the same Blackhawk Drive address. *See* Exhibit M. That card was used to make withdrawals on November 23, 2013, December 5, 2013, December 19, 2013, January 3, 2014, January 24, 2014 and January 30, 2014. *See* Exhibit N. On December 18, 2013, defendant provided the Blackhawk Drive address to another individual via text message. *See* Exhibit O. Further, in text messages with "Dame" on February 11, 2014 and February 12, 2014, defendant discussed Victim T.A. *See* Exhibit P.

- **Victim T.B.:** According to Chase records, on November 7, 2013, an IDES debit card was issued to Victim T.B. at the same Blackhawk Drive

7

address. *See* Exhibit Q. The card in the name of Victim T.B. was used to make withdrawals on January 3, 2014, and January 30, 2014, and a purchase at RC Jewels on January 29, 2014.[3] *See* Exhibit R. A security video image taken at the time of the January 30, 2014 withdrawal shows an individual resembling defendant. *See* Exhibit S.

- **Victim S.L. and Victim J.C.:** According to Chase records, on December 23, 2013, IDES debit cards were issued to Victim S.L. and Victim J.C., both at an address on Lake Park Court in Lynwood, Illinois. *See* Exhibit T. Both cards were used for withdrawals on January 9, 2014. *See* Exhibit U. That address was provided to defendant in a text message from mxxxxxxx_gxxxxxx@yahoo.com on December 17, 2013. *See* Exhibit V. In December 24, 2013, text messages, Defendant alerts "Rio" that Victims S.L. and J.C "should be to Lynwood spot by end of week Fri or Sat." *See* Exhibit W. In January 24, 2014, text messages, defendant told "Rio," "Tomorrow ups [Victim S.L.]," "[Victim J.C.] is coming Monday," "They come by ups envelope," "Lynwood spot." *See* Exhibit X.

---

[3] As set forth in the Government's Sentencing Memorandum, Chase records show that on February 1, 2014, the card issued in the name of Victim M.H. was used for purchases at this same business. The store's system showed the purchaser in both transactions was "Brandon Means" using defendant's Indian Hills address. The email address associated with the transaction was "ninocnotes@gmail.com," which is defendant's email address. In addition, a phone found during the Los Angeles search contained internet history relating to the business (through a Yahoo store) that was dated February 2, 2014.

8

- The text exchanges between defendant and "Dame" between January 2, 2014 and January 29, 2014, included as Exhibit Y, similarly evidence defendant's involvement in the scheme prior to February 1, 2014. In that text exchange, defendant and "Dame" repeatedly discuss addresses to which IDES cards were being sent as well as names of victims.

All of the claims referenced above were determined to be fraudulent. By a preponderance of the evidence, it is therefore clear that defendant was involved in the fraudulent claims filed in the names of Victims M.H., S.C., T.G., T.A., A.H. and T.B., which occurred long before the expiration of his prior sentence.

### III. EVIDENCE OF DEFENDANT'S KNOWLEDGE OF AND INTENT TO EXHAUST THE MAXIMUM AVAILABLE AMOUNTS OF EACH FRAUDULENT CLAIM

During the sentencing hearing, the Court asked for evidence regarding defendant's knowledge of the maximum amount available on fraudulent IDES claims, and any evidence that defendant intended to exhaust the maximum amount available for each claim. While the government has no direct evidence of defendant's knowledge of these amounts, the Court can find by a preponderance of the circumstantial evidence that defendant intended to exhaust the full amount available on each fraudulent claim he filed.

*First*, after initially receiving a claim, even if the claim is fraudulent, IDES sends to the purported claimant a document called a "UI Finding" that sets forth the weekly benefit amount and the Maximum Benefit Balance. Examples of UI Findings for Victims M.H. and T.B., who are discussed above, are attached as Exhibit Z. In addition, after a claim is made, IDES sends to the purported claimant a document

9

called "Benefit Payment Explanation," which similarly includes a weekly benefit amount and a Maximum Benefit Balance. Examples of Benefit Payment Explanation letters for Victims M.H. and T.B. are attached as Exhibit AA. According to the scheme described in defendant's plea agreement, defendant made fraudulent claims and provided specific addresses to which IDES would send information, including these letters, for each victim. Accordingly, defendant can be presumed to know the maximum benefit payment available on each fraudulent claim.

*Second*, as set forth on the chart submitted during the Sentencing Hearing as Government Exhibit 1 (and attached as an under seal exhibit to this filing), for many of the victims whose identities were used to file claims and are associated with defendant, the full amount of the claims were in fact exhausted. Those claims are highlighted in yellow on the attached Government Exhibit 1.

*Third*, while defendant did not exhaust every claim he made, even when he began to withdraw funds using a fraudulently obtained IDES debit card, the government understands from IDES that the claims were stopped by some outside intervention, including a victim's action or detection by law enforcement. In those instances, IDES generates a determination letter indicating that the claim was labeled as "No Law," which, according to IDES, means that they were identified as fraudulent either by law enforcement, IDES, the employer, or the victim. For example, the government selected 16 claims identified on Government Exhibit 1 and requested determination letters from IDES for each of those claims. 14 letters were

provided, and each claim in those 14 letters was identified as "No Law." Those letters are attached as Exhibit BB.

In any event, as Judge Lefkow held in *United States v. Kennedy*, 2014 WL 2742798, *6 (N.D.Ill. Jun. 12, 2014), in a unemployment benefits context where defendant "continued certifying claims, had a system for taking money out of ATMs, and even continued the scheme after she was caught … there is no reason to think that [defendant] wanted anything less than everything [he] could get. In such case, the government is entitled to use the maximum potential loss amount, which is the amount [he] was eligible to receive for each of the [fraudulent] UI claims." Similarly here, where defendant continued certifying claims, had a system for taking money out of ATMs, and even continued the scheme after he was arrested in May 2014 in California, there is no reason to believe defendant did not intend to defraud IDES of the full amount of each fraudulent claim he filed. Accordingly, the appropriate amount for calculating loss is "the maximum potential loss amount," which for defendant is $5,920,598.

                                        Respectfully Submitted,

                                        JOHN R. LAUSCH, JR.
                                        UNITED STATES ATTORNEY

By:   /s/ *Matthew L. Kutcher*
        MATTHEW L. KUTCHER
        Assistant United States Attorney
        United States Attorney's Office
        219 South Dearborn Street
        Chicago, Illinois 60604
        (312) 469-6132

Dated: April 2, 2021